## St. Bernard Mining Company v. Ashby.

(Decided April 29, 1915.)

Appeal from Hopkins Circuit Court.

1.  Master and Servant—Personal Injuries—Evidence—Sufficiency.—
    In an action for damages for personal injuries, evidence examined and held sufficient to take the case to the jury and sustain the verdict in plaintiff's favor.

2. Judgment—Instructions—Punitive Damages —Error—Reversal.— A judgment will not be reversed for error in giving an instruction on punitive damages where it is clear from the evidence and the size of the verdict that punitive damages were not allowed.

3. Damages—Punitive Damages—Error—Reversal.—In an action for damages for personal injuries, evidence examined and held to show that the damages awarded by the jury were merely compensatory.

VIRGIL Y. MOORE and GORDON, GORDON & COX for. appellant.

H. F. BAILEY and YOST & LAFFOON for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

This is an appeal from a judgment awarding the plaintiff damages in the sum of $850.00 for personal in-juries alleged to have been caused by the negligence of defendant.

Plaintiff, J. P. Ashby, had been in the employ of the defendant, St. Bernard Mining Company, for a number of years. At the time of the accident he was engaged in repairing the tracks over which the motors and cars were run.

On the morning of July 15th, 1912, defendant's assistant foreman, J. B. Wyatt, directed the plaintiff to go to the Africa parting in the mine, get his tools which were there, put them on the "trip" and bring them to him at a certain designated place. Thereupon plaintiff went to the Africa parting and got his tools. When the motor trip came by he placed the tools on the front end of the motor. He then informed the motorman that he had been directed by the assistant foreman to bring the tools down on that trip. According to Ashby's testimony, the motorman replied that he didn't know whether Ashby would be on when he got to the bottom or not. Ashby told him that the trip consisted of only sixteen cars and that he could go as slow as he wanted to. Ashby then got on the bumpers of the rear car. Ashby says that, in his judgment, the motor ran faster than he had ever seen it go before. It ran 45 or 50 miles an hour. Time and again on the way the motorman suddenly checked the motor and caused the cars to jam and kick up. Before Ashby could get off, the motor would be in full speed. Just before they got to the bottom parting and while going down hill, the motor was suddenly

checked. This caused the car on which Ashby was riding to be thrown up so suddenly that his head came in contact with the roof of the mine and he was thereby injured. Mike McCormick, a witness for plaintiff, stated that the motor was going about as fast as it would generally go on the last trip; that the last trip is made on fast speed and that the motor in question was going at about the limit. On cross-examination he stated that he jokingly remarked at the time that the motor was going about 40 miles an hour. He also said that the tendency of the hind car is to rear up, and when you are riding the hind one you have to look out for that. He had seen Ashby ride the hind end of a trip and Ashby looked like he was heavy and could not handle himself. He further said that he could not tell how fast the cars were going. However, they were going about as fast as they generally go on the last trip, and that was about the limit. Other witnesses testified that it was safer to ride on the rear than in the motor. For the defendant the motorman testified that he never at any time ran at the rate of 45 or 50 miles an hour. The fastest speed he had ever made was 15 miles an hour; the motor could not be run faster than that and stay on the track. When he passed the knuckle, at the point where plaintiff was injured, he was running about 10 miles an hour. The chief electrician of the company testified that the motor was geared to run from 2 to 6 miles. In going down hill he did not think they could reach 15 miles an hour. Other witnesses testified that plaintiff when riding the trips would handle himself in a very awkward manner.

It will be observed that on the question of excessive speed plaintiff testified that the motor was going 45 or 50 miles an hour. McCormick says that it was going the limit. The motorman fixes the speed at about 10 miles an hour. The electrician testifies that the motor was geared to run at a certain rate, but it is clear from his evidence that the gearing of the motor had but little, if any, effect on its speed when going down hill. Under the circumstances, we conclude that the evidence on the question of the negligent operation of the motor was sufficient not only to take the case to the jury but to sustain the verdict.

It is insisted that the trial court erred in giving an instruction on punitive damages and that the instruction itself was erroneous. It appears that the top of plaintiff's head was cut and bruised. At that time he

weighed about 210 or 215 pounds. At the time of the trial he weighed 180 pounds. After the accident he was confined to his bed for about two weeks and for three weeks he was wholly unable to do any work. He then started to work, but was unable to do anything. After that time he tried to do light work for four or five weeks. During all this time he suffered intensely. Since the accident he had been unable to make his crops or do any work that required him to stoop over. Dr. Davis, who had taken the place of one of the company's physicians who was absent, testified that when he examined plaintiff the latter was suffering from a lacerated wound on the scalp, involving all the soft tissues. When he first examined the wound it was infected. About a year after the injury he observed a nervous disorder in plaintiff, which he attributed to the injury. Two of defendant's regularly employed physicians testified that plaintiff's injury was a mere scalp wound and, in their opinion, no bad effects followed therefrom. It does not appear that these physicians had made any examination of plaintiff at or near the time of the trial. We deem it unnecessary to determine whether the instruction on punitive damages is in correct form or whether or not such an instruction should have been given. It is our rule not to reverse a judgment for error in giving an instruction on punitive damages where it is clear from the evidence and the size of the verdict that no punitive damages were allowed. A careful reading of the evidence in this case convinces us that the damages allowed were no more than sufficient to compensate plaintiff for the actual injury which he received. Under the circumstances, the judgment will not be reversed, even if the court erred in giving the instruction on punitive damages. C. & O. Ry. Co. v. Conley, 124 S. W., 865.

Complaint is also made of the fact that plaintiff was permitted to cross-examine the motorman upon facts, which were collateral and irrelevant to the issue, for the purpose of contradicting him. In reply to this contention it is sufficient to say that the statements about which he was interrogated had a direct bearing on the speed of the motor and were not, therefore, either collateral or irrelevant.

Finding in the record no error prejudicial to the substantial rights of the defendant, we see no reason for disturbing the judgment.

Judgment affirmed.