Everett H. LANNING et al., Appellants,

v.

Roberta BROWN et al., Appellees.

Roberta BROWN, Appellant,

v.

Bessie STEFF, Appellee.

Court of Appeals of Kentucky.

Feb. 21, 1964.

Rehearing Denied May 1, 1964.

a traffic light at the intersection. Mrs. Steff and Mrs. Brown were on their way downtown on Chestnut. As they approached 21st Street Mrs. Brown, who had written down some measurements on a piece of paper preparatory to buying some clothing for her son, was checking the contents of her purse to make sure she had not left this paper at home. Consequently, she did not notice upcoming developments at the intersection and was unable to say which of the drivers had the green light. Appellants contend the trial court erred in refusing to instruct on whether Mrs. Brown was contributorily negligent, citing Mattingly v. Meuter, 275 Ky. 294, 121 S.W.2d 676, 678 (1938); Richie v. Chears, Ky., 288 S.W.2d 660 (1956); and Conley v. Lovely's Adm'r, Ky., 269 S.W.2d 228 (1954).

■ In each of the cases cited there was evidence of conditions such as high speed or drowsiness of the driver actually known to the passenger prior to the accident, from which a jury could reasonably find that the passenger, being forewarned, should have taken preventive steps. But in the absence of circumstances that would serve to put him on the alert the law does not require a passenger to maintain a lookout. As Mrs. Brown had no particular occasion to be keeping a lookout there was no basis on which she could have been found negligent in failing to do so. Refusal of the instruction was proper.

■ Mrs. Brown suffered numerous injuries as the result of which her medical witness, Dr. Zoeller, estimated that "she has a 30 to 35% partial permanent impairment to the body as a whole." In the course of his X-ray examinations the doctor had observed evidence of pre-existing "wear-and-tear" arthritis and some degeneration of an intervertebral disc, all of which was disclosed in his testimony to the jury. In an effort to emphasize the arthritic condition, counsel for appellants sought to question Mrs. Brown concerning statements made in her discovery deposition to the effect that Dr. Zoeller and his associates

---

Robert P. Hobson, Fielden Woodward, John P. Sandidge, Woodward, Hobson & Fulton, Louisville, for Lanning and Jellico Coal & Coke Co.

R. D. McAfee, Edward T. Ewen, Jr., Louisville, for Roberta Brown.

Victor W. Ewen, W. Carey Thompson, Jones, Ewen & MacKenzie, Louisville, for Bessie Steff.

PALMORE, Judge.

Roberta Brown, guest in an automobile driven by Bessie Steff, was injured when the Steff car collided at an intersection with a vehicle driven by Everett Lanning as the agent of Jellico Coal & Coke Company. Her action for personal injuries against both drivers and the Jellico company resulted in a verdict and judgment in the amount of $18,000 against Lanning and his company, who will hereinafter be called the appellants.

The accident occurred at 21st and Chestnut Streets in Louisville. 21st was one-way north and Chestnut one-way east, with

had said (after the accident) her back and shoulder trouble were attributable to arthritis. This evidence was excluded, and we are somewhat at a loss to comprehend under just what theory appellants contend it was admissible. What the doctors told Mrs. Brown was hearsay, incompetent unless for the possible purpose of contradicting testimony of the person or persons who said it. Dr. Zoeller was the only one of them to testify, and he was not questioned with respect to what he told Mrs. Brown. Hence no foundation was laid to impeach him. CR 43.08. Moreover, as his testimony made it clear that she had a pre-existing arthritic condition it would not have been materially contradicted by what Mrs. Brown said in her deposition.

Other statements alleged to have been made by Mrs. Brown, indicating she had suffered back trouble for some time before the accident, were properly admitted. But even if otherwise admissible, what the physicians told her after the accident would not be contradictory of her testimony denying that she had previously suffered back trouble. Therefore, not only do we find no error in the exclusion, but no prejudice either.

■ The trial of this case was held on January 8, 9 and 10, 1962. Appellants' motion for a new trial, served by mail January 16 and filed January 17, listed as one of its grounds misconduct of the trial court in advising the jury panel to the effect, "You will be given a blood-curdling oath but you do not have to pay any attention to it." This ground was not supported by any entry of record, but on January 31 an affidavit of counsel was filed, and it has been treated (apparently by common consent) as duly submitted in support of the motion and as an authenticated record of what took place. The trial judge made and filed a memorandum declining to counter the affidavit and reciting that the remarks in question had been made "to the incoming veniremen immediately prior to the presentation of the instant case" and in the presence of the appellants' counsel. The memorandum further stated that the matter had not been brought to the attention of the court prior to the motion for new trial.

Appellants insist that the objectionable statement of the court to the panel from which the jury was immediately thereafter selected and sworn destroyed the efficacy of the oath, violating Const. § 232 and, in fine, abridging the right of trial by jury guaranteed by Const. § 7.

Certainly it would be improper for a trial court to give prospective jurors to understand that they need not take seriously the oath required to be given them before hearing a case. We are not persuaded that the remarks by the court in this case, lifted out of context, conveyed that impression. But if counsel for appellants really entertained any misgivings in that respect they should have given the court a timely opportunity to correct it.

In Collins v. Sparks, Ky., 310 S.W.2d 45 (1958), it was held that objection to a remark by the trial court indicating disbelief of a witness could be first raised in a motion for new trial. Cf. CR 61.02. It was also more broadly stated in the opinion that since a trial judge is presumed to know how to conduct a fair trial it is unnecessary to call to his attention, by timely objection, his own remarks if they are so manifestly prejudicial that they come within the purview of CR 61.02.

There were two basic circumstances in the Collins case which underlay its rationale. One was that the unfortunate remark from the bench was such that an admonition would not have erased the prejudicial effect from the minds of the jurors and, further, an unsuccessful objection might well have aggravated the harm already done. The other was that the remark was of such palpably prejudicial character that the judge was bound to be cognizant of his error. We do not think the principle of that case fits this one. The alleged error here was committed prior to the swearing of the jury, before the trial. What harm could have

been done by a simple request of the court to ask the jurors, when sworn or immediately thereafter, if they fully understood that they were bound by the oath? Indeed, the matter could have been (but was not) explored on voir dire. If there was a misunderstanding arising out of the court's previous discussion by way of indoctrinating the new jurors, it certainly was remediable and this was the time to do it.

It would appear also that since the objectionable remarks were made as part of a general discourse the trial court did not realize that he may have imparted to the prospective jurors an erroneous and improper impression. Under the circumstances it is not all clear that he should, must, or was bound to have known that he had invested the proceedings with a substantial defect. Again, it would not have hurt appellants to call it to his attention.

It is shown by the record that the jury was sworn, and it is conceded that the oath was in the prescribed statutory form. Appellants seem to have been satisfied that they were receiving a due and proper jury trial according to the "ancient mode" until the verdict was read out. We are not convinced otherwise.

In what has been said thus far we have dealt with this question on the merits. From a technical standpoint, even if it should be conceded that the statement of the trial court did in fact create in the minds of the jurors an attitude of irresponsibility toward their oath, it was a matter going to their fitness to serve, hence required to be raised by challenge before the jury was sworn. KRS 29.025(2). As the late Judge Carroll observed in Crosthwaite v. Crosthwaite, 151 Ky. 364, 151 S.W. 945, 948 (1912), "counsel for the unsuccessful party will not be heard to complain, after they have lost the case, that a juror was disqualified for service, when they

accepted him with knowledge of his disqualification or failed to show his disqualification by asking such questions as they at the time knew would develop it." See also Beach v. Commonwealth, Ky., 246 S.W.2d 587, 590 (1952).

At the close of Mrs. Brown's direct examination on January 8, 1962, her counsel produced a chart listing the special damages to which she had testified, and upon objection by appellants the trial court directed that it be withheld for the time being. When court reconvened on the morning of January 9 to continue with the trial, her attorneys were permitted, over a renewal of the objection, to set up the chart so that it could be and was seen by the jury during the remainder of the day and until the trial ended on the next day, January 10. The figures shown on this chart [1] were as follows:

| Medical Expenses | |
|---|---:|
| General Hospital | $ 19.00 |
| Dr. Kinsman | 35.00 |
| Norton Infirmary | 466.10 |
| Drs. Fischer, Leatherman & Zoeller | 468.50 |
| Back brace | 46.35 |
| Heat lamp | 6.95 |
| Heating pad | 5.95 |
| Transportation to Dr. | 32.20 |
| Special nurses | 76.00 |
| Medicines | 100.00 |
| Lost Wages | 1993.60 |
| Help at home | 1075.00 |
| | 4324.65 |

Appellants contend that the continuous appearance of the chart in view of the jurors after the witness had left the stand served unfairly to emphasize the damages.

The use of testimonial charts is proper. Meglemry v. Bruner, Ky., 344 S.W.2d 808 (1961). Though it was not officially admitted

---

1. At the bottom of the chart the amounts sought for pain and suffering and for loss of earning capacity were listed, but from the context of the transcript we infer that this portion was not displayed. The brief for Mrs. Brown explains that a cover was taped over it.

in evidence as an exhibit, the enumeration of special damages was nothing more than a summary of Mrs. Brown's testimony and, as such, could have been so admitted in connection with it.[2] But it is quite another thing to allow a particular segment of testimony to be advertised, bill-board fashion, after the living witness has vacated the stand and it is not being used in connection with the subsequent testimony of other witnesses.[3] We think it is error to do so, but are not persuaded that the error was prejudicial in this instance. Since no real conflict developed with regard to the evidence of special damages (though the jury may well have been skeptical as to the cost of "help at home"), there was nothing of a countering nature over which it could have had an undue or belittling prominence. "Emphasis" is relative, requiring comparison. Where there is no basis for contrast or comparison there can be no undue emphasis. It may be argued that by keeping the damages before the jury the chart tended to overshadow the importance of the other issues in the case, but we doubt that a properly instructed jury, after argument by able counsel, would be so ingenuous as to decide other issues erroneously merely because it had the special damages so well in mind.

We consider the possibility of prejudice from the chart too remote to warrant a reversal.

The remaining questions in the case involve several comments made in the closing address to the jury by Hon. Davis McAfee, one of Mrs. Brown's attorneys.

██ The first was a statement to the effect that "this is a great big case because Mr. Robert Hobson is over here defending it * * * and not one of the young lawyers or other lawyers in his office."[4] It is beneath the dignity of the profession for lawyers to deal in the personalities of each other in the course of a trial (or elsewhere, for that matter), and we condemn it. However, counsel for appellants had himself cast the first stone in his opening statement to the jury by accusing Mrs. Brown's lawyers of trying to make "a great big case out of an ordinary case." Mr. McAfee prefaced his remark by recalling that statement, and in this frame of reference we do not consider it to have been prejudicial. It cannot be fairly equated with the comment found prejudicial in Walden v. Jones, 289 Ky. 395, 158 S.W.2d 609, 612, 141 A.L.R. 105, 110 (1942), to the effect that defense counsel's identity signified that a verdict "would not hurt" his client. There the connotation focused on who would pick up the check if the defendant lost; here it was directed to the seriousness of the plaintiff's claim.

In his opening statement to the jury counsel for appellants indicated that someone expected to testify for the plaintiff was not telling the truth, and in his closing statement suggested unmistakably that the witness Mrs. Burns was the guilty party. Plaintiff's counsel, in his summation, rejoined as follows:

"I think people who see accidents ought to give their names and when they do, they ought not to be abused and called a liar when they do."

Under the circumstances, our opinion is that this remark was within the broad latitude a lawyer must be allowed in arguing his client's case.

██ The next excerpt of counsel's final address for Mrs. Brown to which objection was raised had to do with the gravity of pain:

" * * * Death is a relief from pain. One of the most horrible of all

---

2. There seems to be very little authority on the subject. This, however, is our view.

3. Again, there is a dearth of precedent to the point.

4. The jury was duly admonished to disregard the remark.

tortures and you will have read this or heard of it; one of the most horrible of all tortures is the water torture, where a man is tied down and a drop of water permitted to drop on his body."

■ After an objection was overruled he went on to say in substance that he was not contending that Mrs. Brown was now suffering the agonies of death, but that she did have constant pain for which she ought to be amply paid. Again, we are unable to say that such comments were beyond the pale of legitimate argument.

The last item is the toughest to judge:

"If we give her—use any figure— I wouldn't suffer the pain she's going through for fifty dollars a day."

Mr. Hobson: "If Your Honor, please,—"

Mr. McAfee: "Twenty dollars a day? Ten dollars a day?"

Mr. Hobson: "We object to that argument."

The Court: "I'll overrule the objection."

Mr. Hobson: "As to what he would take?"

The Court: "That's right."

Mr. Hobson: "You think that's proper measure of—"

The Court: (Interrupting) "I have overruled the objection."

Mr. McAfee: "I will say this: I don't think Mr. Hobson would go through this for fifty dollars a day."

Mr. Hobson: "I object to that argument."

Mr. McAfee: "I don't think anybody would take any money to go through the suffering she's got."

Mr. Hobson: "I want Your Honor to rule on my objection."

The Court: "The objection is overruled. Go ahead, Mr. McAfee."

Mr. McAfee: "I don't think anybody would want to go through it for any amount."

There have been a number of cases, some from this court, condemning the "Golden Rule" tactic of asking the jurors to fix damages according to what they would take for similar injuries to themselves or to members of their families. See, for example, Murphy v. Cordle, 303 Ky. 229, 197 S.W.2d 242 (1946). We think it is just as bad for counsel to speak in terms of what he or opposing counsel would or would not take, and that the objection should have been sustained and the jury admonished accordingly. However, the size of the verdict [5] (signed by 10 jurors) does not indicate that the jury was deluded by this argument, and we are of the opinion that the possibility of prejudicial effect is insufficient to justify reversal. We realize this is a matter of judgment, each case being different from the others, but it falls our lot to make the last decision, and this is it.

The relief sought by Mrs. Brown's cross-appeal against Mrs. Steff being contingent on a reversal in favor of appellants, it is unnecessary for us to consider it.

The judgment is affirmed on appeal and cross-appeal.

5. $18,000, of which at least $3,000 must be attributed to the special damages. Mrs. Brown had a life expectancy of about 32 years and, according to Dr. Zoeller, was 30 to 35% permanently impaired.